**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert M. LEAL, Defendant–Appellant.**

**No. 94–1740.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 19, 1995.

Decided Jan. 4, 1996. \*

Rehearing and Suggestion for Rehearing
En Banc Denied Feb. 12, 1996.

---

\* This decision was originally issued as an "unpublished decision" filed on January 4, 1996. On January 25, 1996, the court granted the government's motion to recommend the case for full-text publication.

Kathleen Moro Nesi, Asst. U.S. Atty. (argued and briefed), Detroit, MI, for plaintiff-appellee.

James L. Feinberg (argued and briefed), Robert M. Morgan (briefed), Detroit, MI, for defendant-appellant.

Before: BROWN, BOGGS, and NORRIS, Circuit Judges.

BOGGS, Circuit Judge.

Robert Leal, a pharmacist convicted of 16 counts of violating 21 U.S.C. § 841(a)(1) for running a "pill mill," appeals from his conviction and sentencing on a host of grounds. We find all of Leal's arguments without merit and affirm Leal's conviction for the reasons given below.

## I

Leal was charged with 87 counts of distribution of controlled substances. The indictment indicated that the offenses occurred between October 1989 and May 1992. Mr. Leal entered a plea of not guilty to all counts.

The charges stem from a joint DEA and FBI effort to investigate Parkview Pharmacy, which was owned by Leal. The investigation centered on the relationship between Mr. Leal and Dr. Veera Sripinyo, who ran a medical clinic in Warren, Michigan. Because of suspicions that Dr. Sripinyo was engaged in selling prescriptions for controlled substances, an undercover agent, posing as a patient, went to Dr. Sripinyo's office and obtained a prescription for amphetamines after Dr. Sripinyo administered a cursory examination, including taking the agent's blood pressure over several layers of clothing. The agent was given a business card for Mr. Leal's pharmacy. The DEA then inspected Leal's pharmacy and reviewed all the prescriptions for controlled substances Leal had filled, beginning in 1987. The inspection revealed that Dr. Sripinyo's prescriptions comprised more than 90% of all of Parkview Pharmacy's business. The DEA noted that, despite the small size of the pharmacy, it was at or near the top of the rankings for the sale of controlled substances in the Detroit metropolitan area.

Additional evidence about Mr. Leal's operations was obtained from a number of sources. Testimony of "patients" and customers further corroborated the illegal nature of the prescriptions. Leal often filled prescriptions for Tylenol 4 (Tylenol plus codeine) and Doriden, commonly known on the street as "fours and doors." When taken in combination, Tylenol 4 and Doriden produce a euphoric effect similar to heroin. There was evidence offered at trial tending to show that Dr. Sripinyo may have provided some legitimate medical services to his clientele, who were mostly drug addicts. Expert testimony established that many of the prescriptions Dr. Sripinyo had written and Leal had filled were outside the course of standard medical practice and for no legitimate medical purpose. Charts showing the amounts of controlled substances provided by Leal to Dr. Sripinyo's patients were entered into evidence, including charts of patients who did not testify at trial about their medical conditions.

Dr. Sripinyo was indicted in this matter as well, but fled the United States before trial. After Dr. Sripinyo fled the country, the prescriptions Leal filled for controlled substances dropped off dramatically. Evidence of Dr. Sripinyo's flight was introduced at Leal's trial.

One of Dr. Sripinyo's patients, Cheryl Britt, testified that her aunt, Annie McLinden, also a patient, had died. The district court was vigilant, however, in keeping out any insinuation by the government that Dr. Sripinyo was responsible for her death.

The government made an improper comment on Leal's demeanor at closing argument. The government prosecutor pointed out that Leal had commented suspiciously to his counsel after a witness had testified that he had joked with Leal about needing appetite suppressants prescribed by Dr. Sripinyo for the sole purpose of improving his sexual performance.

The court's instructions to the jury were based on regulations promulgated under the

authority of 21 U.S.C. § 841, and the district court refused Leal's proposed jury instruction relating to the civil duties of pharmacists under Michigan law.

The jury convicted Leal on 16 counts, found him not guilty on 12 counts, and could not decide on the other 59 counts.

Leal was sentenced based on all of the controlled substance prescriptions he filled that were written by Dr. Sripinyo and by another doctor operating in a similar fashion named Dr. Marang, even though there was no direct evidence that each of these prescriptions was issued outside the scope of proper medical practice. When converted into marijuana equivalent, the amount of drugs Leal was held accountable for totalled 4,021.1064 kilograms.

On March 10, 1995, a panel of the Sixth Circuit affirmed the district court's grant of a bond pending appeal, because Leal did not represent a risk of flight and because the panel deemed his jury instruction argument to raise a substantial question of preemption law.

## II

Leal raises seven issues on appeal: (1) does sufficient evidence support his conviction; (2) was there error in admitting Dr. Sripinyo's medical records when there was no individualized testimony about the medical condition of each of the underlying patients; (3) was there error in admitting evidence that Dr. Sripinyo fled the United States; (4) was Leal denied a fair trial by a prosecution comment at closing argument; (5) did the district court abuse its discretion in denying Leal's motion for a mistrial because the government had introduced evidence showing that a former patient of Dr. Sripinyo's had died; (6) did the district court err in refusing Leal's requested jury instruction about the civil duties of pharmacists under Michigan law; and (7) did the district court err in sentencing Leal on the basis of all prescriptions he filled for Drs. Sripinyo and Marang, even though there was evidence suggesting that not every one of these prescriptions was written outside the course of legitimate medical practice.

## III. SUFFICIENCY OF THE EVIDENCE

When a defendant contests the sufficiency of the evidence supporting his criminal conviction, the court is to consider all of the evidence in the light most favorable to the prosecution, and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). "The government must be given the benefit of all inferences which can reasonably be drawn from the evidence ... even if the evidence is circumstantial." *United States v. Adamo,* 742 F.2d 927, 932 (6th Cir.1984), *cert. denied sub nom. Freeman v. United States,* 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985).

There is more than enough evidence in the record from which a rational jury could have concluded that Leal was guilty beyond a reasonable doubt of violating 21 U.S.C. § 841. The government needed to show here that the prescriptions filled by Leal were not issued for a valid medical purpose, and that Leal knew the prescriptions were invalid. *United States v. Hughes,* 895 F.2d 1135, 1143 n. 11 (6th Cir.1990). The government could also have shown that Leal should have known that the prescriptions were invalid, but "deliberately closed [his] eyes to what would otherwise have been obvious." *United States v. Seelig,* 622 F.2d 207, 213 (6th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980). "Circumstantial evidence alone can sustain a guilty verdict and ... to do so, circumstantial evidence need *not* remove every reasonable hypothesis except that of guilt." *United States v. Stone,* 748 F.2d 361, 362 (6th Cir.1984), *cert. denied,* 498 U.S. 822, 111 S.Ct. 71, 112 L.Ed.2d 45 (emphasis in original).

There was enough circumstantial evidence to find that Dr. Sripinyo issued prescriptions that fell outside the scope of medical practice: (1) he gave perfunctory exams, for instance taking an undercover DEA agent's blood pressure readings over several layers of clothing; (2) he prescribed weight control pills for those who were not overweight; (3)

he prescribed controlled substances to patients with non-serious symptoms; (4) he issued prescriptions for the commonly abused "upper" and "downer" combination "fours and doors," when there is no therapeutic basis for combining these drugs to treat any real medical problem; (5) he wrote prescriptions before he diagnosed patients; (6) he wrote prescriptions through the mail for a patient who was in Florida at the time; and (7) he fled the country when he learned of a federal investigation.

There was also enough circumstantial evidence to support a jury finding that Leal knew about Dr. Sripinyo's illegitimate practices: (1) Dr. Sripinyo told patients to fill their prescriptions at Leal's pharmacy[1]; (2) Dr. Sripinyo monitored whether patients were going to Leal's pharmacy; (3) a blow-up version of Leal's business card with a map was prominently displayed in Dr. Sripinyo's office for patients to see; (4) After Dr. Sripinyo began to associate closely with Leal, Dr. Sripinyo's office rule telling patients to go to "your" pharmacy was eliminated and patients were given Leal's business card instead; (5) more than 90% of the prescriptions Leal filled for controlled substances came from Dr. Sripinyo; (6) Leal lied to investigators about the availability of refill information he stored on computer; (7) Leal's pharmacy was dispensing more controlled substances than even large chain pharmacies during the period of his association with Dr. Sripinyo; (8) after Dr. Sripinyo fled the country, the amount of controlled substances that Leal sold declined sharply; (9) Dr. Sripinyo's patients would often arrive at Leal's pharmacy in groups with identical prescriptions; (10) Leal would issue refills in advance; (11) patients of Dr. Sripinyo's discussed street prices and the euphoric effect of "fours and doors" with Leal; (12) Leal marked up controlled substance prices 788% as compared to a national average of 86%[2]; (13) Leal filled a prescription for an appetite suppressant for a 163-pound patient of Dr. Sripinyo who admitted he was taking the drug to increase his sexual performance; (14) pharmacists testified that Leal should have seen the pattern developing, and that Leal breached professional ethical standards in filling Dr. Sripinyo's prescriptions; and (15) Leal mailed prescriptions written by Dr. Sripinyo to a patient in Florida.

Especially in light of the recent case of *United States v. Veal*, 23 F.3d 985, 988 (6th Cir.1994) (per curiam), the evidence presented here is more than sufficient. *Veal* held that the evidence in that case was sufficient to support the conviction of a pharmacist cooperating in a "pill mill" operation similar to that of Leal and Dr. Sripinyo, where expert witnesses testified that any reasonable pharmacist would have been suspicious of a prescription of "fours and doors."

Leal cites *United States v. Leon*, 534 F.2d 667, 677 (6th Cir.1976), to support his claim that the circumstantial evidence is insufficient here. *Leon* is distinguishable, however, because in that case there was only one piece of circumstantial evidence connecting a criminal defendant to the illegal gambling operation uncovered by the government. In light of the cumulative nature of the circumstantial evidence here, and its quantity, *Leon* does not require this court to hold that the evidence against Leal was insufficient. Moreover, *Leon* applies only to the "toss up situation" where "the circumstantial evidence supports no more than a choice between reasonable inferences of fact (i.e., one tending to support criminality or the other innocence)." *United States v. Turner*, 490 F.Supp. 583, 589 (E.D.Mich.1979), *aff'd*, 633 F.2d 219 (6th Cir.1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981).

Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence here from which a rational jury could have found the two elements con-

---

1. This seems to be a fairly standard practice in these kinds of "pill mill" operations. *See United States v. Tokarevich*, 995 F.2d 1068, 1993 WL 188376, at **1 (6th Cir.1993) (per curiam) (doctor running "pill mill" in violation of Section 841 referred patients to particular pharmacy).

2. *See United States v. Cooper*, 868 F.2d 1505, 1512 (6th Cir.), *cert. denied*, 490 U.S. 1094, 109 S.Ct. 2440, 104 L.Ed.2d 996 (1989) (evidence that pharmacy charged prices well in excess of average prices supports an inference that the pharmacist knew drugs were prescribed for illegal purposes).

stituting a violation of Section 841 by Leal were satisfied.

## IV. ADMISSION OF DR. SRIPINYO'S AND DR. MARANG'S MEDICAL CHARTS

Dr. Marang's medical charts were never admitted, so Leal's quarrel with their admission is obviously pointless.

Leal objected at trial to the admission of Dr. Sripinyo's charts on the grounds of hearsay, and that they were protected by doctor-patient privilege. The district court ruled against Leal on these issues, and Leal does not challenge these rulings on appeal. Now, Leal argues that the records should have been excluded because they were irrelevant and prejudicial. Leal did not make these arguments on a timely basis at trial, however. He never objected on grounds of prejudice, and objected on relevance grounds only after the evidence had been admitted. The district court properly refused to revisit its admissibility ruling.

 When a defendant does not object to the admission of evidence at trial, the admission of such evidence is reviewed for plain error. *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982). There was no plain error in finding the charts to be relevant. The government's theory behind the relevance of the charts as evidence is shown by the following conjunction of facts: (1) there were large numbers of prescriptions for controlled substances written by Dr. Sripinyo and filled by Leal; (2) these prescriptions formed the bulk of Leal's business; (3) the controlled substances prescribed were properly prescribed only for short periods, but Dr. Sripinyo prescribed them for extended periods for an unchanging group of patients; and (4) in light of this pattern in Dr. Sripinyo's practice, Leal continued to fill prescriptions the doctor had written. Dr. Sripinyo's lack of medical purpose and Leal's knowledge thereof were the two elements that the government needed to prove in order to demonstrate a violation of Section 841 by Leal.

Leal cites *United States v. Jones*, 570 F.2d 765, 768–69 (8th Cir.1978), to support the argument that the trial court committed prejudicial error by admitting all of Dr. Sripinyo's medical charts without showing that each of the underlying prescriptions recorded on those charts were unlawfully issued. *Jones* is distinguishable on a number of grounds. First, in *Jones* 478 prescriptions written by a doctor charged with violating § 841 were admitted, without any supporting evidence to show that the prescriptions were issued for an illegitimate purpose. This is not the case here. Some of the charts admitted at Leal's trial were the "high-volume" medical records of the patients of Dr. Sripinyo who testified at trial about their medical histories. This testimony helped to establish Dr. Sripinyo's illegitimate purposes in prescribing the controlled substances. Second, expert testimony established that some of the drug combinations shown on the records were per se suspicious, like the "fours and doors" combination.

Third, Leal was indicted based on the evidence in these medical records. Under Federal Rule of Evidence 404(b), the *Jones* court thought that the additional prescriptions in that case were being introduced to show wrongdoing on occasions other than those which were the subjects of the government's indictment. (The government's indictment in that case was based on invalid prescriptions issued to undercover officers.) Here, however, there is no violation of Rule 404(b) because the evidence was not introduced to show that Leal had done something illegal in the past and thus must have been guilty of the current offense. Rather, Leal was indicted partly on the basis of the evidence in those medical records. Moreover, it was Leal, not Dr. Sripinyo, who was on trial, making *Jones* inapposite.

This case is more like *United States v. Lash*, 937 F.2d 1077, 1087 (6th Cir.), *cert. denied sub nom. Ross v. United States*, 502 U.S. 949, 112 S.Ct. 397, 116 L.Ed.2d 347 (1991) (holding there was no Rule 404(b) violation where the evidence was admitted to show knowledge, and knowledge was an element of the crime charged). The medical records in this case could have been admitted to show that Leal had knowledge that Dr. Sripinyo was prescribing controlled sub-

stances outside the proper scope of medical practice, thus falling into the *Lash* exception.

## V. ADMISSION OF EVIDENCE OF DR. SRIPINYO'S FLIGHT

██ Leal failed to object on grounds of prejudice to the admission of evidence that Dr. Sripinyo fled the country once he learned of an investigation. He objected only on hearsay grounds. Therefore, the standard of review is plain error. *United States v. Cox,* 957 F.2d 264, 267 (6th Cir.1992). Applying the plain error test, the admission of this evidence created no prejudice because the evidence was extremely probative of the government's theory that Dr. Sripinyo and Leal had an agreement to run a "pill mill" operation, outweighing any possible prejudice. Once Dr. Sripinyo fled the country, Leal's prescriptions for controlled substances fell off dramatically.

## VI. IMPROPER ARGUMENT

The government concedes the impropriety of its question to the jury at closing argument, "Did you notice in trial, when I asked that question, how Defendant turned to his attorney and said, 'I got to tell you something'?" The prosecutor was referring to a question asked of a witness about his joking with Leal that he took an appetite suppressant, prescribed by Dr. Sripinyo, merely to improve his sexual performance. Given the concession that the remark was improper, this court must determine whether the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. De-Christoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).

██ The misconduct here did not infect the entire trial. In *United States v. Duval,* 902 F.2d 35, 1990 WL 52371, at **4 (6th Cir.1990) (per curiam), we found arguments by the prosecution that the demeanor of witnesses indicated truthfulness were improper, but did not destroy the fairness of the trial, where the remarks were isolated and there was much other evidence tending

to show the defendant's guilt. The same can be said here—only one improper remark was made by the government, and the questionable evidence relating to the true reason for the taking of an appetite suppressant by one of Dr. Sripinyo's patients was minimal in the overall scheme of the government's proof.

Dicta in *Cunningham v. Perini,* 655 F.2d 98, 100 (6th Cir.1981), *cert. denied,* 455 U.S. 924, 102 S.Ct. 1286, 71 L.Ed.2d 467 (1982), may indicate a different standard for comments on the demeanor of a criminal defendant favorable to Leal's argument:

> [A] prosecutor's comment upon a defendant's demeanor might be scrutinized under the Due Process Clause. Until a defendant has placed his own demeanor in evidence by taking the stand to testify, his personal appearance at the trial is irrelevant to the question of his guilt or innocence.... This is not to say, of course, that the prosecutor's commentary on the petitioner's demeanor, if made in a federal court, might not be subject to correction by an appellate court in the exercise of its supervisory powers.

Here, Leal did take the stand. But whether the defendant had taken the stand or not is a weak basis on which to hold that such a prosecutorial comment is improper or not.

*Cunningham* cited *United States v. Wright,* 489 F.2d 1181 (D.C.Cir.1973), to support its dicta that the standard applied to review a district court's rulings on improper argument might differ from the standard applied to review a state court's rulings on improper argument in an action to obtain a writ of habeas corpus. In *Wright,* the District of Columbia Circuit stated:

> That the jury witnesses courtroom behavior of the defendant in any event does not make it proper for prosecutor to tell them, with the court's approval, that they may consider it as evidence of guilt; what the jury may infer, given no help from the court, is one thing, and what it may infer when the court in effect tells it that the courtroom behavior of defendant constitutes evidence against him is something altogether different.

*Id.* at 1186. Here, of course, the court did not tell the jury to consider evidence of the witness's demeanor, only the prosecutor did.

*Wright* and *Cunningham,* while they contain excellent language from Leal's perspective, really only establish that the government engaged in misconduct here. But the government has already admitted this. Thus, the *DeChristoforo* standard still applies, and the question remains whether the prosecutor's improper comments permeated the trial. Here, the prosecutor's comments were isolated, and they magnified evidence that was relatively insignificant. There was ample evidence on which a jury could have based a conviction apart from that which the government's improper argument called attention to. And as for the improper argument itself, this was cured by the court's instruction to the jury that the lawyers' arguments were not evidence.[3]

## VII. MOTION FOR A MISTRIAL BASED ON THE ADMISSION OF EVIDENCE THAT A PATIENT OF SRIPINYO'S HAD DIED

■ A district court's denial of a defendant's motion for a mistrial is reviewed for abuse of discretion. *United States v. Chambers,* 944 F.2d 1253, 1263 (6th Cir.1991), *cert. denied,* 502 U.S. 1112, 112 S.Ct. 1217, 117 L.Ed.2d 455 (1992). There was no abuse of discretion here because the district court sustained Leal's objection at trial on the grounds that any evidence attempting to link the death of Cheryl Britt's aunt, Annie McClinden, to Dr. Sripinyo's medical competence would be unduly prejudicial. In light of this, only evidence that McClinden had died came into the record. The court was vigilant to guard against the government's attempts to suggest that McClinden died because she had been a patient of Dr. Sripinyo.

I'm not going to allow any nexus between medical care and [McLinden's] demise because there has been no testimony whatsoever—only testimony, and again I listened very, very carefully for this because I an-

ticipated this, only testimony is [*sic* ] that she's dead. Anything other than that I will not allow to [*sic* ] either side to comment on. Other than she's dead, there's been no nexus between her death and anything else in terms of testimony here.

In light of the exclusion of any evidence that could have been prejudicial, it was not an abuse of discretion for the district court to deny Leal's motion for a mistrial.

## VIII. JURY INSTRUCTIONS AND PREEMPTION

Leal did not preserve the issue of the propriety of the jury instructions because he failed to object to the jury instructions either before or after they were given. "No party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before or after the arguments are completed or at both times." Fed. R.Crim.P. 30. Therefore, this court must review Leal's argument on appeal for plain error. *United States v. Pearce,* 912 F.2d 159, 163 (6th Cir.1990), *cert. denied sub nom. Thorpe v. United States,* 498 U.S. 1093, 111 S.Ct. 978, 112 L.Ed.2d 1063 (1991).

The district court charged the jury as follows:

[T]he United States must prove beyond a reasonable doubt that Robert Leal did knowingly and intentionally distribute drugs listed in the indictment, and did so other than in good faith in the usual course of professional practice, and in accordance with a standard of pharmaceutical practice generally recognized and accepted in the United States. Good faith in this context means judgment as to a patient's medical needs. It connotes an observance of conduct in accordance with what a pharmacist should reasonably believe to be proper pharmaceutical practice.

Leal now argues that the jury should also have been instructed that he had no duty as a pharmacist under Michigan law to identify "addicted customers and their over-prescrib-

---

3. Even applying the standard discussed in *United States v. Carroll,* 26 F.3d 1380, 1383–90 (6th Cir.1994), Leal's challenge to the prosecutor's statement at his trial must fail, because the com-

ment by the prosecutor on Leal's demeanor was isolated (and therefore not flagrant) and because there is other evidence of his guilt which is overwhelming.

ing physicians, either independently or through the combined efforts of other local pharmacists." *Adkins v. Mong,* 168 Mich. App. 726, 425 N.W.2d 151, 152 (1988). Even under the standard for reviewing a failure to give a requested jury instruction when the issue is properly preserved for appeal, however, Leal's argument must fail. Under the easier standard, which is not applicable here, Leal would have to show that his proposed instruction was (1) correct, (2) not substantially covered by the charge already submitted to the jury, and (3) concerned a point so important in the trial that the failure to give it substantially impaired presentation of his theory of the case. *United States v. Carr,* 5 F.3d 986, 992 (6th Cir.1993). Here, Leal's argument fails to satisfy the first part of the *Carr* test. It would have been error for the district court to have given the jury charge Leal requested, under 21 C.F.R. § 1306.04, which provides, in relevant part:

A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, *but a corresponding duty rests with the pharmacist who fills the prescription.* An order purporting to be a prescription issued not in the usual course of professional treatment, or in legitimate or authorized research, is not a prescription within the meaning and intent of the law, and the person knowingly filling such a prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of law relating to controlled substances.

*Ibid.* (Emphasis supplied).

■ *Veal,* 23 F.3d 985, and other Sixth Circuit cases establish that it is a violation of Section 841 if Leal filled prescriptions that were not issued for a medical purpose and if he did so knowing the prescriptions were invalid. *Veal,* 23 F.3d at 987–88. Thus, both Section 841 and 21 C.F.R. § 1306.04 impose a federal duty on Leal to be vigilant in filling prescriptions, so as to avoid filling those that were issued for a non-medical purpose.

Whether state law imposes an equivalent civil or criminal duty is irrelevant.

Leal makes much of 21 U.S.C. § 903:

No provision of this subchapter [which includes Section 841] shall be construed as indicating an intent on the part of Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together.

Leal argues that in order for the federal duty imposed by Section 841 and its regulations to be binding on him, these federal laws would have to preempt *Adkins,* and in light of Section 903 Congress could not have intended for this federal law to have such a preclusive effect. This argument is meritless. Section 903's intent and function is clear— none of the federal anti-drug statutes, including Section 841, are intended to prevent the states from also criminalizing or regulating illegal drugs. Leal imagines that there is some ambiguity in Section 841 and its regulations, but the duty imposed by federal law on pharmacists dealing with controlled substances is unequivocal. If a state law purported to eliminate this duty, it would be void under the Supremacy Clause.

But there is no such conflict between federal law and state law here. It is perfectly possible for a state to hold that a pharmacist is not liable in tort for failing to do what a federal criminal statute says he must do. There is no need for this law to give way under the Supremacy Clause. *Adkins* itself recognizes this point; it distinguished a Fifth Circuit case addressing a violation of Section 841 by a pharmacist on the basis that that case involved the criminal law. It is not a state's refusal to impose some law that typically triggers preemption concerns, but a state's positive regulation of some matter in a manner inconsistent with federal regulation.

It was not plain error for the district court to have refused to give the instruction based on Michigan state law that Leal requested.

Moreover, Leal's proposed jury charge was obviously incorrect as a matter of law, so it would fail even under a standard of review more· exacting than the plain error standard that applies here.

## IX. SENTENCING ON THE BASIS OF ALL CONTROLLED SUBSTANCE PRESCRIPTIONS

For sentencing purposes, the district court found by a preponderance of the evidence that all of the prescriptions for controlled substances that Leal filled for Drs. Sripinyo and Marang were outside of proper medical practice. Therefore, a clear error standard of review is applicable. *United States v. Sims,* 975 F.2d 1225, 1242 (6th Cir.1992), *cert. denied sub nom. Gardner v. United States,* 507 U.S. 932, 113 S.Ct. 1315, 122 L.Ed.2d 702 (1993). *See also* 18 U.S.C. § 3742(e) (mandating clear error standard of review of facts found by district court in sentencing matters). Leal was assigned a base offense level of 34 in his presentence report (PSR) based on USSG § 2D1.1(c)(3)[4]. The district court adopted the PSR, which computed that Leal was responsible for distributing controlled substances approximating 4,020 kilograms in marijuana equivalent.

Leal cites *United States v. Walton,* 908 F.2d 1289 (6th Cir.), *cert. denied,* 498 U.S. 990, 111 S.Ct. 532, 112 L.Ed.2d 542 (1990), to support his argument that the district court committed a clear error in sentencing him. In *Walton,* the method used to extrapolate the amount of cocaine that certain defendants were responsible for dealing was held illegitimate. ·Basically, the government had evidence that, in April 1986, the defendants were dealing 3.5 grams of cocaine per week. Paraphernalia evidence indicated that they were still dealing some unknown quantity of cocaine in October 1988. The government then estimated the total amount of cocaine distributed by the defendants between April 1986 and October 1988 as 455 grams, on the assumption that they continued to deal 3.5 grams per week throughout the whole period. In light of evidence that the defendants' income throughout part of the period did not seem to match this pattern of distribution, and that when choosing between different estimates a court should err on the side of caution, *Walton* found the extrapolation method used to be unreasonable. *Id.* at 1301–02. The *Walton* test is whether a defendant is "more likely than not actually responsible for a quantity greater than or equal to the quantity for which [he] is being held responsible." *United States v. Zimmer,* 14 F.3d 286, 290 (6th Cir.1994) (quoting *Walton,* 908 F.2d at 1302).

*Walton* is inapplicable to this case because *Walton* involved a speculative estimation of how much cocaine the defendants had distributed, whereas it is clear here how many prescriptions for controlled substances were filled by Leal. There was evidence in the record tending to show that some of the prescriptions issued by Dr. Sripinyo and filled by Leal were perhaps legitimate. Despite this, the district court insisted that, "I heard no testimony, very frankly ... that there was [a] legitimate purpose." The district court did not discuss whether it drew any inferences from this evidence, or make any credibility determinations in connection with its admission. Rather, it perfunctorily found that there was no evidence to support the claim that any of Dr. Sripinyo's prescriptions were for a valid medical purpose. Because there was evidence in the record to support Leal's claim, we must examine the kind of evidence that Leal adduces to support his argument that he was improperly sentenced.

. . . .

**4.** USSG § 2D1.1 provides, in relevant part:
*Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses): Attempt or Conspiracy*
   (a) Base Offense Level (Apply the greatest):
   . . . .
   (3) the offense level specified in the Drug Quantity Table set forth in subsection (c) below.

(c) . . .
(3) ... least 3,000 KG but less than 10,000 KG of Marihuana Level 34

. . . .

The prescriptions that Leal filled for Drs. Sripinyo and Marang were converted into marijuana equivalents, although, of course, no prescriptions were filled for marijuana.

Before doing this, however, we note that the district court would have had to err substantially in order for this court to remand Leal's case for resentencing. Leal was held responsible at sentencing for distributing 4,021.1064 kilograms of controlled substances in marijuana equivalent. In order for Leal to obtain any reduction in his sentence, he would have to demonstrate that more than 1,021.1064 kilograms were erroneously ascribed to him by the district court. The testimony Leal points to in the record, provided by a handful of patients, could not support a conclusion that the district court erred to such a great extent.

Moreover, the district court could have drawn certain inferences, not explicitly set forth during sentencing to be sure, that the testimony of the relevant patients did not establish that Dr. Sripinyo was prescribing controlled substances to these patients for legitimate medical purposes. Consider some of the testimony Leal points to: Dr. Sripinyo examined Cheryl Britt, one of the government's witnesses, and determined that Britt had a tumor on her ovary. Dr. Sripinyo then referred her to another doctor. Leal never linked any of the prescriptions he filled for controlled substances to Britt's ovary condition, however. Britt testified that she did have real problems sleeping, as well as headaches, and that she told Sripinyo of these problems and received drugs to treat them. Again, Leal did not link the prescriptions he filled to prescriptions for what we can assume were real ailments. Moreover, Britt testified that other doctors did prescribe Tylenol 3 for her legitimate ailments, but only Sripinyo gave her Tylenol 4. Britt was also accomplished at faking back problems in order to obtain prescriptions for "fours and doors."

While Clifton Walker testified that he went to Dr. Sripinyo to support his drug habit, he also testified that he had legitimate medical problems. For instance, Dr. Sripinyo prescribed nitroglycerine tablets to Walker for a heart condition. Leal was not sentenced for prescribing nitroglycerine tablets, however. Walker also testified that he received controlled substances to treat a weight problem, and he represented he had a weight problem.

Even assuming Leal was held responsible for prescriptions of controlled substances to treat Walker's weight problem, however, these prescriptions are not alleged by Leal to even approach the more than 1,000 kilogram marijuana equivalent Leal needs to make a dent in his sentencing.

■ Similar stories can be told about Dr. Sripinyo's patients Adolphus Harris, Joyce Redd, and James Warren. These people testified they were going to Dr. Sripinyo for what they knew were illicit purposes, but they also had legitimate ailments. In each case, such evidence did not require the conclusion that the controlled substances prescribed by Dr. Sripinyo were for no legitimate medical purpose, but the evidence would certainly support such a conclusion. In this context, although there was evidence to support a finding that at least some of the Sripinyo prescriptions filled by Leal were for a legitimate purpose, a reasonable finder of fact would also have been entitled to draw the inference that Dr. Sripinyo could have prescribed these controlled substances without checking to see whether these patients really required the drugs for medical purposes. The district court might have concluded that Dr. Sripinyo was either indifferent to, or unaware of the medical problems about which the various witnesses testified—in other words Dr. Sripinyo would have prescribed controlled substances to his patients whether they had any legitimate ailments of the kind certain patients testified to or not. Given the volume of the evidence supporting Leal's conviction, and that Leal can only point to extremely weak evidence from five patients who often faked their maladies, we choose to make that inference. Because the district court could have concluded that the evidence suggesting some prescriptions were legitimate was unreliable, and because only some prescriptions prescribed to a handful of patients were possibly legitimate, there was no error in the district court's conclusion that a preponderance of the evidence supported sentencing Leal under USSG § 2D1.1(c)(3) (3,000 to 10,000 kilograms of marijuana equivalent) based on all the Sripinyo and Marang prescriptions for controlled substances.

X

All of Leal's arguments on appeal are lacking in merit, and therefore his conviction and sentencing are **AFFIRMED.**