**NOT RECOMMENDED FOR PUBLICATION**
File Name: 05a0201n.06
Filed: March 22, 2005

**No. 02-6169**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

ALI HADI SAWAF,

     Defendant-Appellant.

                                         /

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY

BEFORE:    KEITH and CLAY, Circuit Judges; OBERDORFER, District Judge.[*]

    **CLAY, Circuit Judge.**  Defendant, Ali Hadi Sawaf, appeals his conviction and sentence pursuant to 21 U.S.C. § 841(a)(1) for writing or approving prescriptions that were not issued for a legitimate medical purpose and were not in the usual course of his medical practice. After a jury trial, Defendant was convicted of eight of the eleven counts against him, resulting in a 240-month sentence. On appeal, Defendant argues 1) that the evidence presented at trial was insufficient to support his conviction on six charges; 2) that his conviction on all counts should be overturned because he was denied a fair trial; and 3) that his sentence should be vacated in light of the Supreme

_____

[*]The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

Court's recent decision in *United States v. Booker*, 534 U.S. —, 125 S.Ct. 738 (2005) and because the district court erred in calculating the amount of pills illegally prescribed by Defendant and in enhancing Defendant's sentence under § 3B1.3 of the Federal Sentencing Guidelines.

For the reasons set forth below, we **AFFIRM** Defendant's conviction but **VACATE** his sentence and **REMAND** for re-sentencing.

## BACKGROUND

### Procedural History

In June of 2001, a federal grand jury in the Eastern District of Kentucky returned an indictment charging Defendant with eleven counts of unlawfully distributing controlled substances, including Schedule II drugs Oxycontin and Tylox, by writing or approving prescriptions that were not issued for a legitimate medical purpose and were not in the usual course of Defendant's professional practice as a urologist, in violation of 21 U.S.C. § 841(a)(1).

The indictment also included three firearms counts against Defendant for possession of firearms after being convicted of a felony and domestic abuse, in violation of 18 U.S.C. § 922(g). Following a two-week jury trial, Defendant was convicted of eight of the eleven drug charges (Counts 1, 3, 4, 5, 8, 9, 10, 11) but was acquitted of all of the firearms charges and the remaining three drug charges. Count 1 charged Defendant with knowingly distributing Schedule II, III, and IV controlled substances by writing or approving prescriptions that were not in the usual course of his professional practice. The remaining seven counts involved particular prescriptions issued by Defendant to law enforcement officers working in an undercover capacity. Five counts involved prescription of Oxycontin on December 1, 2000 (Count 4); January 29, 2001 (Count 11); January

4, 2001 (Count 9); January 3, 2001 (Count 8); January 30, 2001 (Count 10). One count arose from prescription for Tylox on November 1, 2000 (Count 3); and one count from a prescription for Vicodin on December 13, 2000 (Count 5).

At sentencing, the district court accepted the probation officer's findings that Defendant's sentencing range was between 235 to 293 months imprisonment based on an offense level of thirty-six and a category III criminal history. The district court then sentenced Defendant to a concurrent term of 240-months imprisonment on each of Counts 1, 4, 8, 9, 10 and 11 and a concurrent term of 60 months imprisonment on each of Counts 3 and 5. On September 4, 2002, Defendant filed a timely notice of appeal with this Court, appealing his conviction and sentence.

Oral argument in this case was held on June 8, 2004. The Supreme Court issued its opinion in *Booker* on January 12, 2005. Subsequently, Defendant moved for leave to file a supplemental letter brief in light of *Booker*. We granted that motion, and both Defendant and the government have filed supplemental letter briefs.

## Facts

The facts are taken from the record developed before the district court.[1] Defendant Ali Hadi Sawaf is a medical doctor specializing in urology. He voluntarily left his practice of medicine at the Daniel Boone Clinic in Harlan, Kentucky, in August 2000, to start his own practice in Harlan. When Defendant first started out on his own, he borrowed an office to use on weekends from a physician named Dr. Alan Freid ("Dr. Freid"). After only two weekends, Dr. Freid asked Defendant to leave

---

[1] We note that Defendant's brief to this Court did a very poor job of presenting the facts of the case. Defendant devotes exactly a page and a half to the facts of the case and merely stated the procedural and not the substantive facts of the case.

his office after Freid learned that his in-office pharmacy was "literally running out of controlled substances" such as Oxycontin because Defendant was filling out prescriptions to patients on an "unbelievable scale." (J.A. at 625-26). According to Dr. Freid's trial testimony, he drove by the office one weekend and observed that "it was almost like a circus was in town or something. It was unbelievable. People all over the place, milling about." (J.A. at 626). Dr. Freid testified that when he confronted Defendant about writing prescriptions for controlled substances, Defendant allegedly told him "Well, I have the white coat." (J.A. at 626).

Another physician, Dr. Richard Ocampo ("Dr. Ocampo"), agreed to share his office with Defendant; Dr. Ocampo shared his office with Defendant from October 2000 to around the middle of January 2001. Dr. Ocampo told Defendant that he could not accommodate his practice due to the presence of numerous patients who came to see Defendant. After leaving Dr. Ocampo's office, Defendant set up shop in a mall office with very little medical equipment, but with a large number of customers. Defendant was arrested on February 1, 2001, after law enforcement executed several undercover operations that gave them probable cause to believe that Defendant prescribed or approved of prescriptions for controlled substances that were not issued for a legitimate medical purpose and were not in the usual course of his medical practice. Defendant's patient files were seized along with $17,620 in cash found at the office.

Trial testimony from pharmacists, Defendant's employees, Defendant's patients, law enforcement officers, and medical experts revealed that Defendant issued a large number of prescriptions for controlled substances during his practice from August 2000 to February 2001. Harlan pharmacist Joe Myers ("Myers") testified that after Defendant left the Daniel Boone Clinic,

his narcotics prescriptions became "more and more frequent, with more repetition out of patients" and without explanation on the prescription form he filled out. (J.A. at 200-03). Myers testified that he could not keep up his supply of controlled substances based on the large number of prescriptions approved by Defendant. Another Harlan pharmacist named Jon McNiel ("McNiel") testified that he noticed patrons were coming in often with prescriptions for Oxycontin from Defendant. Because they noticed numerous patrons returning to refill prescriptions, both Myers and McNiel stopped filling prescriptions for controlled substances that came from Defendant. Similar testimony of over-prescription came from Harlan pharmacists Brian Key and Todd Walters. James Nevils ("Nevils"), a pharmacist from Harrogate, Tennessee, about forty-five minutes from Harlan, testified that Defendant called and asked him to fill out prescriptions since Harlan pharmacists refused to fill prescriptions approved by him. Nevils initially agreed to fill the prescriptions, but stopped filling prescriptions from Defendant when "excessive amounts of people" came for "pretty potent medication" prescribed by Defendant. (J.A. at 278). Harrogate pharmacy records show that the pharmacy filled three of Defendant's prescriptions in September of 2000, five in October of 2000, twenty-two in November of 2000, and over 1000 prescription between December of 2000 and January of 2001. Harrogate's filled prescriptions for Schedule II drugs included: 5,870 Oxycontin 40-milligram pills; 3,600 20-milligram Oxycontin pills; 300 10-milligrams Oxycontin pills; 3,095 dosage units of Tylox; 570 dosage units of methadone; 1,010 dosage units of Roxicet; approximately 1,600 dosage units of Percocet; 195 dosage units of Percodan; and 60 dosage units of Seconal. Ed Carlton, a pharmacist from a town near Harlan, testified that he stopped filling prescriptions from

Defendant because "I didn't feel that any one physician could humanly see that many patients and put out that many and do it thoroughly and correctly in a single day." (J.A. at 295).

In the fall of 2000, Kentucky's Attorney General ("AG") office began an investigation of Defendant based on complaints from pharmacists that Defendant was over-prescribing Oxycontin. Gregory Shay ("Shay"), an investigator with the AG office, visited Defendant in an undercover capacity as part of the investigation. On October 16, 2000, Shay went to Defendant's office and complained that he had a fractured leg and was addicted to Tylox and "hurt all over." (J.A. at 324). Defendant diagnosed Shay with back pain and gave Shay a prescription for Vicodin and arranged for a subsequent appointment a month later. On November 1, 2000, Shay came two weeks prior to his mid-November appointment and after asking Shay about his "back pain," which Shay never complained of, Defendant gave Shay a prescription for Tylox. (J.A. at 328-29). This conduct was the basis for the charge in Count 3 of the indictment. Shay returned to Defendant on December 1, 2000, without having the X-ray that Defendant requested he should get; nevertheless, Defendant gave Shay a prescription for Oxycontin at Shay's request and advised Shay that he should have the prescription filled at the Harrogate pharmacy. This conduct was the basis for Count 4 in the indictment. Shay again returned to Defendant on December 13, 2000, without any X-rays, yet Defendant gave Shay a prescription for Vicodin. This conduct was the basis for Count 5.

Around the time that Defendant filled prescriptions he was on probation for a Michigan conviction and was being supervised by Sharon Meachum ("Meachum"), a Kentucky probation officer. Meachum testified at trial that Defendant informed her that she could visit his office any time and that he would give her a prescription for any pills she desired. On December 21 and 22,

2000, Harlan police officer Shawn Bryant ("Bryant") met with Defendant and told him of his great need for prescription drugs for himself and his wife. On January 3, 2004, Defendant prescribed Oxycontin for Bryant and his wife without any physical examination. This conduct was the basis for Count 8 in the indictment. On January 4, 2001, Bryant visited Defendant to discuss problems Bryant was having, and Defendant allegedly told Bryant that he would take care of him, if Bryant takes care of him; Defendant also prescribed Oxycontin to Bryant without urging. This conduct was the basis for Count 9 of the indictment. Detective Roger Hall ("Hall") of the Harlan Sheriff's office visited Defendant and asked about the effects of Oxycontin, to which Defendant supposedly responded: "My friend, it's the best medicine. Let me write you some." (J.A. at 544). Defendant also recommended and prescribed Viagra for Hall which, along with Oxycontin, would prolong feelings of euphoria. This conduct was the basis for Count 11 in the indictment. On January 30, 2003, Defendant was visited by James Vicini ("Vicini"), another Harlan Sheriff's detective. Defendant prescribed Viagra and Oxycontin to Vicini without examination. This conduct formed the basis of Count 10.

At trial, Dr. Douglas Kennedy ("Dr. Kennedy"), an expert witness for the government, examined 50 randomly-selected files of Defendant's patients. Dr. Kennedy concluded that none of the controlled substance prescriptions in the 50 files had a legitimate medical purpose or had been issued in the usual course of professional medical practice. Dr. Kennedy testified that "[e]ach patient received potent . . . medication for no apparent reason other than [a] subjective complaint." (J.A. at 1013). Several former employees of Defendant gave testimony that Defendant's patients increased exponentially, apparently after word got around that Defendant prescribed strong

medications; these employees further testified that Defendant invariably prescribed controlled substances to these patients and rarely performed even routine medical check-ups before prescribing the medications. Based on the foregoing, a jury convicted Defendant of several counts of distributing controlled substances in violation of 21 U.S.C. § 841(a)(1). Defendant now appeals his conviction and sentence.

## DISCUSSION

### I. Whether the evidence was sufficient to support Defendant's convictions on Counts 1, 3, 4, 5, 8, and 9.

Defendant contends that his convictions on Counts 1, 3, 4, 5, 8, and 9 should be overturned on the basis that sufficient evidence to support them was not presented at trial. We review a challenge to the sufficiency of the evidence to determine "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential element of a crime beyond a reasonable doubt.'" *United States v. Crayton*, 357 F.3d 560, 573 (6th Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *United States v. Clay*, 346 F.3d 173, 176 (6th Cir. 2003). Further, "[w]hen reviewing a conviction on appeal, this Court resolves all conflicts in the testimony in favor of the government and draws every reasonable inference in its favor." *United States v. Doe*, 226 F.3d 672, 680 (6th Cir. 2000).

Defendant claims the district court should have granted his motion of acquittal because the government did not satisfy its burden of proof on Count 1 of the indictment and, in any event, he was entitled to judgment as a matter of law because of entrapment. Count 1 of the indictment charged Defendant with knowingly and intentionally distributing Schedule II, III, and IV controlled substances by writing or approving prescriptions without legitimate medical purpose. Defendant

maintains that the evidence presented at trial was insufficient to find him guilty of Count 1. He argues that the strongest trial testimony for the government came from Dr. Kennedy who relied on only fifty randomly-selected files from Defendant's patients to determine that Defendant wrote or approved of prescriptions without a legitimate medical purpose. Defendant's argument suffers from a familiar weakness—the absence of any reference to case law to support his position.

In *United States v. Leal*, 75 F.3d 219 (6th Cir. 1996), the defendants, a pharmacist and a physician, were convicted of multiple counts of distributing controlled substances in violation of 21 U.S.C. § 841(a)(1). *See Leal*, 75 F.3d at 221. Although no direct evidence was offered that prescriptions by the physician, whom the government alleged conspired with the pharmacist to distribute the controlled substances, were outside the scope of proper medical practice, a jury convicted the defendants based in large part on testimony from expert witnesses. *Id.* at 222-23. Similarly, in *United States v. Veal*, 23 F.3d 985 (6th Cir. 1991), circumstantial evidence from an expert witness was critical to convicting a pharmacist of participating in a "pill-mill." *Veal*, 23 F.3d at 988; *see also United States v. Wells*, 211 F.3d 988, 997 (6th Cir. 200) (expert testimony was critical circumstantial evidence used to convict the defendant).

In the instant case, Defendant argues that testimony at trial, including Dr. Kennedy's expert testimony, was insufficient to convict him of Count 1 in the indictment. Yet, just as expert testimony was critical to the jury's conviction in *Wells*, so too was Dr. Kennedy's testimony, based only on his review of fifty random patient files, critical to Defendant's conviction in the instant case. A reasonable trier of fact could conclude, based on Dr. Kennedy's testimony, that Defendant wrote or approved prescriptions without a legitimate medical purpose. In the instant case, additional

testimony came from Defendant's former employees, who testified that Defendant did not always conduct exams before issuing prescriptions and from pharmacists who testified to filling a deluge of prescriptions for Defendant's patients. Viewing this evidence in the light most favorable to the government, as we must, we believe the evidence at trial was sufficient for a reasonable jury to convict Defendant of knowingly and intentionally distributing Schedule II, III, and IV controlled substances without a legitimate medical purpose.

Alternatively, Defendant argues that he should have been acquitted because he was entrapped as a matter of law. Specifically, Defendant contends that the conduct that formed the basis of Counts 3, 4, 5, 8, and 9 all involved false and misleading statements by law enforcement officers working in an undercover capacity to entrap him by seeking prescriptions. In this Circuit, entrapment is a valid legal defense to a crime only when a defendant sets forth evidence that (1) the government induced the defendant to commit the crime and (2) the defendant was not predisposed to commit the crime. *See United States v. Khalil*, 279 F.3d 358, 364 (6th cir. 2002); *United States v. Burns*, 298 F.3d 523, 539 (6th Cir. 2002). In the instant case, Defendant asserts that law enforcement officers came into his office complaining of pain and concerned about sexual performance and he therefore prescribed Viagra, Oxycontin and Tylox to these patients without knowing of their hidden agenda. This may be true, but in the instant case, the testimony at trial revealed that it was routine practice for Defendant to prescribe controlled substances without conducting medical exams. At the very minimum, the evidence shows that Defendant was predisposed to prescribe controlled substances without conducting medical examinations. Thus, even if the Defendant's inducement argument were accepted, he cannot escape the predisposition

element. *See United States v. Tuder*, 28 F.3d 1420, 1429 (6th Cir. 1994). We therefore conclude that there was sufficient evidence for a reasonable jury to convict Defendant on Counts 3, 4, 5, 8, and 9 and that Defendant has not made a showing that he was entrapped by law enforcement officials.

## II.     Whether Defendant's due process rights were violated.

Defendant's second argument is that his due process rights were violated, by two events at trial and sentencing. First, Defendant argues that the government committed deception by arguing at the close of trial that at sentencing it would not ask the court to hold Defendant responsible for all of the prescriptions from January of 2000 to February of 2001. Our review of the record, however, reveals that the government did "reserve the right" to make arguments regarding the pill count at sentencing and did state that the specificity of such pill count would be determined at sentencing. Therefore, Defendant's contention that the government deceived the court and himself is without substance.

More importantly, however, Defendant argues that the district court erred in permitting the government to cross-examine defense witnesses using information learned from the Kentucky All Schedule Prescription and Electronic Reporting System ("KASPER").[2] Aside from stating that the information gave the government an unfair advantage and that timely objections were filed to prohibit introduction of the reports, Defendant does not present any argument as to why the reports should not have been introduced at trial.

---

[2]KASPER reports provide, among other things, a listing of controlled substances dispensed to persons in Kentucky, and although KASPER information is not public, such information may be obtained by any person pursuant to a court order or by court officers pursuant to a "bona fide specific investigation." *See* KY. REV. STAT. ANN. § 218A.202 (Banks-Baldwin 2004).

A district court's evidentiary rulings are reviewed on appeal under an abuse of discretion standard. *See United States v. Chance*, 306 F.3d 356, 385 (6th Cir. 2002); *United States v. Middleton*, 246 F.3d 825, 837 (6th Cir. 2001). It is settled that a district court abuses its discretion "when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *United States v. Spikes*, 158 F.3d 913, 927 (6th Cir. 1998) (citations omitted).

In the instant case, the district court made a specific legal finding that the reports were obtained pursuant to a "legitimate" investigation and further found that, pursuant to the statute, "no attempt [has] been made to enter any of this information into record." (J.A. at 1330-31). On these facts, it cannot be said that the district court abused its discretion in allowing the government to cross-examine defense witnesses based on the reports. Defendant's argument that all his convictions should be overturned because he was denied a fair trial is therefore without merit.

**III.     Whether the district court properly sentenced Defendant.**

**A.     Defendant's sentence is vacated and remanded under Booker.**

As noted above, in a letter brief filed with this Court after the Supreme Court's announcement of its opinion in *United States v. Booker,* 534 U.S. —, 125 S.Ct. 738 (2005), Defendant asserted for the first time that the district court's determination of the relevant pill count in this case violated his rights under the Sixth Amendment. In its letter brief on the issue, the government agreed with Sawaf.[3]

---

[3]The government also asserted in its letter brief that the district court's application of a sentencing enhancement in this case for abuse of a position of trust by use of a special skill, in violation of §3B1.3 of the Sentencing Guidelines, was similarly a violation of Defendant's Sixth

We agree with the parties that because the district court sentenced Defendant pursuant to the then-mandatory Federal Sentencing Guidelines, and because the number of pills attributed to Defendant was not admitted by him or determined by a jury beyond a reasonable doubt but rather was determined by the district court, his Sixth Amendment rights were violated. We therefore will vacate his sentence and remand to the district court for re-sentencing. *See United States v. Oliver*, 397 F.3d 369, 377-82 (6th Cir. 2005).

### B.      Defendant's other sentencing claims

Although *Booker* excised that part of the Guidelines which made them mandatory, sentencing courts must continue to take into consideration the recommended Guidelines sentence. *Booker*, 125 S.Ct. at 764. This Court will continue to provide guidance as to the proper interpretation of any Guidelines provisions whose application is challenged on appeal, and we do so now with respect to Defendant's remaining sentencing claims. *See United States v. McDaniel*, 398 F.3d 540, 551 (6th Cir. 2005)

In addition to his *Booker* claim, Defendant challenges his sentence of 240-months imprisonment on essentially two grounds. First, he contends that the district court acted arbitrarily and capriciously and erred in determining the pill count which supported the offense level used for sentencing. Second, Defendant argues that the two-level enhancement imposed for abuse of trust

---

Amendment rights. Because we are vacating Defendant's sentence and remanding for resentencing on the ground that the calculation of the pill count was *Booker* error, we need not determine either a) whether the government is correct that this sentencing enhancement violated Defendant's Sixth Amendment rights or b) whether we could reach a *Booker* error that has never been raised by a defendant but has been asserted by the government.

and use of special skill violated Defendant's double jeopardy protections. We will discuss each of this arguments in turn.

### 1. Whether the district court erred in determining the pill count for purposes of calculating Defendant's offense level.

Defendant asserts that the district court uncritically accepted the probation officer's recommendation that Defendant's base offense level was 34 based on Defendant's issuance of, or approval of, prescriptions for 87,760 pills. We agree that the district court might have more clearly identified the basis of its factual findings, and encourage the district court to do on remand. However, we note that the district court stated in the judgment that it was not considering any pills counted on the charges for which Defendant was acquitted, and additionally would only consider those pills that were filled after November 1, 2000[4] and only Schedule II narcotics. This approach is consistent with the addendum to the pre-sentence report, which makes it clear that the prescriptions for Schedule II narcotics filled from December 2000 to February 2001 result in a quantity well in excess of the number of pills required for a base offense level of thirty-four.

As to the district court's finding that the probation officer correctly determined Defendant's base sentence, Defendant suggests that the government manipulated the sentencing guideline by using Count 1 as the "umbrella charge" to "create the massive offense level of 34." (Defendant's Br. at 11). However, the district court adopted the probation officer's recommendation in the pre-sentence report, which calculated Defendant's base offense by relying solely on the counts on which

---

[4]Defendant now contends that the trial court "arbitrarily and capriciously" set the date at November 1, 2000. Def. Brief at 10. However, at sentencing, Defendant specifically argued that prescriptions filled before September 2000 should not be counted because evidence at trial did not support a finding that there were problems with those prescriptions.

Defendant was convicted. After sustaining several of Defendant's objections to the pre-sentence report, the district court found that Defendant's sentence guideline range remained 235 to 293 months for the offenses of conviction. Defendant argues that if the pill count on the charges on which he was convicted was the sole basis for his base offense level, then his base offense level would have been 14, not 34. We find this argument unpersuasive in light of the trial testimony from pharmacists who filled Defendant's prescriptions and the detailed application of the sentencing guidelines by the probation officer for each of the counts for which Defendant was convicted.[5] Regardless, Defendant reiterates the same argument that the district court's findings were arbitrary and capricious, but does not point to specific factual or legal support for his argument that the calculation of his base offense level was error. In our view, Defendant's claim of error in this regard is without merit.

2.   **Whether the district court erred in enhancing Defendant's sentence under § 3B1.3.**

Defendant contends that the district court improperly enhanced Defendant's sentence under § 3B1.3 of the Sentencing Guidelines for abusing his position of trust by using his special skill. Section 3B1.3 of the Sentencing Guidelines provide for an upward adjustment of a defendant's sentence as follows:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the

---

[5]The probation officer determined Defendant's base offense level by first recognizing that Defendant's criminal activity "was distribution of Schedule II, III, and IV controlled substances with a marijuana equivalency of 8683.38 KGS. The offense level specified in the **Drug Quantity Table** under U.S.S.G. § 2D1.1(c)(3), for at least 3,000 KG but less than 10,000 KG of marijuana, sets a base level of 34." (J.A. at 2029).

offense, increase by two levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role).

U.S.S.G. § 3B1.1.

The district court found that Defendant abused both his position of trust and his special skill and enhanced his sentence under § 3B1.3. Defendant argues that the district court erroneously enhanced his sentence because "an abuse of trust or skill is included in the base offense level or specific offense characteristic." U.S.S.G. § 3B1.3. That is, Defendant argues that the counts on which he was convicted required that he be a licensed medical doctor as a prerequisite for conviction, and therefore an abuse of trust or skill was already included in the calculation of Defendant's base offense level and was a specific offense characteristic of the charges on which he was found guilty. Defendant is mistaken about the proper application of § 3B1.3. The sentencing guidelines define a "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training, or licensing." U.S.S.G. § 3B1.3 cmt. 2.

Defendant cited no case in his briefs to this Court to support his view on this issue, although we have previously addressed precisely this issue. In *United States v. Johnson*, 71 F.3d 539 (6th Cir. 1995), we determined that § 2D1.1, the underlying guideline in both *Johnson* and the instant case, "does not consider whether the offense was committed by a doctor or anyone else. Thus, defendant's use of a special skill was not taken into account by § 2D1.1 and should be considered by the District Court, through application of guideline § 3B1.3." *Johnson*, 71 F.3d 539 at 544. Johnson further explained "[a]nyone can be found guilty of violating 21 U.S.C. § 841(a)(1) by

distributing pharmaceuticals.  Doctors are merely exempt from this section when they dispense or

prescribe controlled substances in the regular course of professional practice."  *Id.* (citing *United*

*States v. Moore*, 423 U.S. 122, 131 (1975)).  The district court's enhancement of Defendant's

sentence under § 3B1.3 was therefore entirely appropriate.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** Defendant's conviction, but **VACATE** his sentence

and remand for resentencing.