DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant, John Zaffino, has appealed from a judgment of conviction for aggravated murder with a firearm specification in the Summit County Court of Common Pleas. We affirm.
 I {¶ 2} At approximately 12:09 p.m. on June 16, 2001, Jeff Zack was fatally shot in the face while sitting in his automobile at the gasoline pumps at the BJ's store near Chapel Hill Mall. Several witnesses heard a loud noise and saw a "ninja-style" motorcycle come through the area at the time of the homicide. The state sought to prove that the rider on the motorcycle fired the fatal shot, and that Appellant was the rider.
 {¶ 3} Appellant was indicted on one count of aggravated murder, and one count of murder, with gun specifications on each count. Following a plea of not guilty, the matter proceeded to trial before a jury. The jury returned a verdict of guilty as to aggravated murder and the gun specification. The second count of the indictment was dismissed. Appellant was sentenced to a term of life imprisonment for aggravated murder and three years for possession of a firearm, to be served consecutively.
 {¶ 4} Appellant has timely appealed and has assigned five errors for review. The third and fourth assignments of error have been combined to facilitate review.
 II Assignment of Error Number One
"Appellant's due process rights and right to equal protection under the laws were violated when he was denied a preliminary hearing as a result of summit county's direct indictment program in violation of the fifth
and fourteenth amendments to the United States Constitution and ArticleI, Section 16 and Section 2 of the ohio constitution and in violation of Criminal Rule 5 and O.R.C. 2945.73(A)."
 {¶ 5} Through Appellant's first assignment of error, he has asserted error in the failure of the trial court to provide him with a preliminary hearing based on (1) a violation of Crim.R. 5(B) and R.C.2945.73(A), and (2) a denial of due process and equal protection.
 {¶ 6} The relevant procedural facts are as follows. On September 25, 2002, Appellant was arrested by Akron police, pursuant to a warrant, for the aggravated murder of Jeff Zack on June 16, 2001. On October 7, 2002, Appellant was indicted by the Summit County Grand Jury on one count of aggravated murder and one count of murder while committing or attempting to commit felonious assault, each with firearm specifications. On October 9, 2002, Appellant appeared in the Summit County Court of Common Pleas and entered a plea of not guilty to the indictment.
 {¶ 7} On December 16, 2002, Appellant filed a motion to dismiss the indictment because of the state's failure to afford him a preliminary hearing pursuant to Crim.R. 5(B) and R.C. 2945.73(A). By journal entry dated January 22, 2003, the trial judge denied the motion to dismiss, finding that the failure to provide a preliminary hearing is not jurisdictional, the indictment may stand, and the petitioner was not deprived of any constitutional rights by not having a preliminary hearing.
 {¶ 8} At a pre-trial hearing on February 18, 2003, Appellant's counsel asserted as additional grounds for his motion to dismiss, a claim that the failure to accord a preliminary hearing to Appellant constituted a violation of the Equal Protection Clause of the United States Constitution. Specifically, he argued that Summit County had a "direct indictment" program, but that because one of the three municipal court systems within Summit County, i.e., the Cuyahoga Falls Municipal Court, continued to conduct preliminary hearings, he was denied the equal protection of the laws. Appellant reiterated the equal protection basis for his motion to dismiss at his sentencing hearing. The trial judge overruled the motion on both occasions without explanation.
 {¶ 9} Upon review, we conclude that while Crim.R. 5(B)[1] and R.C. 2945.73[2] prescribe that a preliminary hearing shall be held within a designated time period, the failure to provide a preliminary hearing within the specified time periods does not automatically entitle a defendant to a dismissal of the charges against him.
 {¶ 10} At the outset, we note that the purpose of a preliminary hearing is not to determine guilt or innocence. White v. Maxwell (1963),174 Ohio St. 186, 188, certiorari denied, 375 U.S. 880, 11 L.Ed.2d 112. Rather, "[t]he only purpose of a preliminary hearing is to determine whether sufficient facts exist to warrant the court in binding the accused over to the grand jury[.]" State v. Wigglesworth (1969),18 Ohio St.2d 171, paragraph one of the syllabus; see, also, State v.Morris (1975), 42 Ohio St.2d 307, 325-26. Consequently, "once an indictment has been returned by the grand jury, a preliminary hearing before a magistrate is no longer necessary." Wigglesworth,18 Ohio St.2d 171, paragraph one of the syllabus.
 {¶ 11} Further, any dismissal resulting from exceeding the time limits of Crim.R. 5(B) or R.C. 2945.73 is not self-executing. Rather, the defendant must take "some timely and proper action" to secure such a dismissal. State v. Wood (1976), 48 Ohio App.2d 339, 342. A motion to dismiss for failure to hold a timely preliminary hearing "should be made initially at the level where something can be done about it before a grand jury returns an indictment." (Emphasis added.) State v. Whipple
(Jan. 2, 1983), 1st Dist. No. C-820206.
 {¶ 12} Therefore, if an indictment is handed down before a timely and proper action is taken to secure a dismissal, the right to a preliminary hearing is extinguished. Wood, 48 Ohio App.2d at 342, citingState ex rel. Haynes v. Powers (1969), 20 Ohio St.2d 46. "Neither Ohio law nor the Ohio Constitution require a preliminary hearing nor confer a right upon an accused to a preliminary hearing where he has been indicted by the Grand Jury." State v. Azcuy (May 26, 1994) 10th Dist. No. 88AP-529. Accord State v. Tipler (Feb. 16, 2000), 9th Dist. No. 19344, at 10-11. The Ohio Supreme Court has indicated that no rights or defenses are lost for failure to have a preliminary hearing. White,174 Ohio St. at 188.
 {¶ 13} Second, the indictment that was subsequently issued in this case is a valid charging document. An otherwise valid indictment need not be dismissed merely because it was returned after the time limits imposed on a preliminary hearing. State v. Parker (Sept. 2, 1980), 10th Dist. Nos. 80AP-67 and 80AP-68. The Parker court stated:
"R.C. 2945.71 and R.C. 2945.73 do not require the return of a direct indictment within a certain time limit; nor do they mandate that an otherwise valid direct indictment be dismissed merely because the grand jury returned it subsequent to the time limit imposed on a preliminary hearing, but before the dismissal of the case in municipal court. Thus, the indictment was without prejudice, despite the fact that the defendants were not granted a preliminary hearing within the time limits required by R.C. 2945.71." Id.
 {¶ 14} See, also, Styer v. Brichta (1990), 69 Ohio App.3d 738, 743
("If the time limits for a preliminary hearing have been exceeded the state may nevertheless prosecute by way of original indictment."); Statev. Norfus (Nov. 10, 1999), 9th Dist. No. 98CA007271, at 4 (The lack of a preliminary hearing is no bar to a subsequent indictment on felony charges.); State v. Aberle (June 24, 1992) 5th Dist. No. CA 91-33, citingState v. Pugh (1978), 53 Ohio St.2d 153 (A defendant who was not accorded a timely preliminary hearing could subsequently be indicted for the same offense for which he was originally arrested.); State v. Hayslip (May 6, 1991), 12th Dist. No. CA90-05-012, citing State v. Bonarrigo (1980),62 Ohio St.2d 7, 12 and State v. Pugh (1978), 53 Ohio St.2d 153 (The failure to provide a preliminary hearing to an accused within the time limits of R.C. 2945.71 "is not fatal to a conviction based on a subsequent indictment for the same offense.").
 {¶ 15} An analysis of the precise language of R.C. 2945.73 further supports this conclusion. The remedy for failure to timely bring a person to trial is a "discharge," whereas the failure to provide a timely preliminary hearing is a "dismissal" of the charges. See R.C. 2945.73 (A) and (D). See, also, State v. Spencer (July 18, 1980), 6th Dist. Nos. E-80-4, E-80-5, E-80-6, where the court wrote:
"It is obvious that the legislature did not intend that an accused should be `discharged' and to bar any further criminal proceedings against the accused based on the same conduct where the accused was not accorded a preliminary hearing within the time provided in R.C. 2934.71 and 72."
 {¶ 16} Similarly, the Committee Comments to R.C. 2945.73 observe that although a failure to afford a timely trial for a misdemeanor or felony invokes a dismissal "with prejudice," a failure to afford a timely preliminary hearing requires that "that the case be dismissed as on a nolle prosequi." Ohio courts have held that where a charge is dismissed pursuant to a nolle prosequi, another prosecution for the same offense is permissible. See e.g., State v. Johnson (1990), 68 Ohio App.3d 272, 277, citing Sander v. Ohio (S.D.Ohio 1973), 365 F. Supp. 1251; State v. Monroe (June 14, 2000), 4th Dist. No. 99CA632.
 {¶ 17} In this case, Appellant did not bring a motion to dismiss in the municipal court at all, and he did not file a motion to dismiss in the common pleas court before the grand jury returned the indictment against him. Instead, Appellant filed a motion to dismiss based on Crim.R. 5 and R.C. 2945.73(A) in the common pleas court two months after the indictment was returned, and did not assert equal protection as a basis for such motion until four months after the indictment was issued and on the eve of trial. Such motions are not "timely or proper" actions to obtain a dismissal for lack of a preliminary hearing. Wood,48 Ohio App.2d at 342. Appellant was properly indicted by the grand jury before any steps were taken by him to secure a dismissal of the charges against him. Consequently, the right to a preliminary hearing was extinguished.
The first assignment of error is not well taken.
 Assignment of Error Number Two
"Appellant was denied his due process and confrontational rights as secured by Article I, Section 10 of the Ohio Constitution and theFifth Amendment to the United States Constitution, when the state called a witness to the stand and the court excused the witness after the witness invoked her privilege against self-incrimination."
 {¶ 18} In this assignment of error, Appellant has contended that he was prevented from confronting a witness called by the state, resulting in a violation of his constitutional rights to due process and confrontation.
 {¶ 19} During the presentation of its case in chief, the state called Cynthia George to the stand After answering a few preliminary questions — name, address, husband's name, number of children — the witness' attorney asked the trial judge to remove the jury from the courtroom. The trial judge complied. After a short voir dire of the witness, the trial judge concluded that the witness had exercised her privilege against self-incrimination and declared her unavailable to testify. The trial judge then brought the jury back into the courtroom and instructed the jury that the witness was unavailable to testify.
 {¶ 20} Appellant contends that he was denied his due process and confrontational rights by this process. However, the witness did not testify to anything that might be considered evidence against Appellant and it is therefore difficult to understand the basis of Appellant's confrontation claim. In any event, Appellant failed to object to the process at the time it occurred, thereby waiving his right to raise the issue on appeal. Alleged errors which arise during the course of a trial and which are not brought to the attention of the court through objection at a time when they could be remedied are waived and may not be raised on appeal, absent plain error. State v. Loza (1994), 71 Ohio St.3d 61, 75.
Appellant's second assignment of error lacks merit.
 Assignment of Error Number Three
"The evidence in this case was insufficient as a matter of Law to support a conviction of aggravated murder and as a result the appellant's rights as protected by Article I, Section 16 of the Ohio Constitution andFifth Amendment of the United States Constitution were violated."
 Assignment of Error Number Four
"The verdict in this case was against the manifest weight of evidence; appellant's rights as secured by Article I, Section 16 of the Ohio Constitution and the Fifth Amendment of the United States Constitution were violated."
 {¶ 21} Through these two assignments of error, Appellant has contended that the evidence presented at trial was insufficient to support a conviction of aggravated murder, and furthermore, that his conviction was against the manifest weight of the evidence.
 {¶ 22} Crim.R. 29(A) provides that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus, followingJackson v. Virginia (1979), 443 U.S. 307, 61 L.Ed.2d 560. A reviewing court will not overturn convictions on sufficiency of evidence claims unless reasonable minds could not reach the conclusion reached by the trier of fact. See State v. Tibbets (2001), 92 Ohio St.3d 146, 162.
 {¶ 23} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3, citing State v. Thompkins, 78 Ohio St.3d 380, 390 (Cook, J. concurring). When a defendant asserts that his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."State v. Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 24} This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 25} In reviewing sufficiency of the evidence and weight of the evidence claims, this Court will consider that the elements of an offense may be established by direct evidence, circumstantial evidence, or both. See State v. Durr (1991), 58 Ohio St.3d 86, 92. Circumstantial and direct evidence are of equal evidentiary value. Jenks, 61 Ohio St.3d at 272.
 {¶ 26} The state's theory of the case, as supported by evidence presented at the trial, was that Zack and Cindy George had a long-term sexual relationship, dating back to 1991. Zack, in fact, fathered a child with her, something apparently unknown to George's husband By May 2001, the relationship was ending and Zack was becoming increasingly upset by that. Cindy George, on the other hand, was being harassed with hang-up telephone calls. Her husband thought Zack was responsible for the telephone calls. Telephone records from March through May 2001, established that hundreds of calls to Cindy George's telephone originated on Zack's telephone.
 {¶ 27} Sometime in the year 2000, Cindy George began a relationship, also sexual in nature, with Appellant. By April 2001, Appellant knew that Cindy George was being harassed. Sometime in the spring of 2001, Appellant got into a fight with Zack and beat him up. The harassing telephone calls to Cindy George continued.
 {¶ 28} In April or May 2001, Appellant purchased a weapon from a friend, and that weapon used bullets that were consistent with the size of the projectile found at the scene of the murder. Three weeks before the homicide, Cindy George gave Appellant $5,300 in cash to purchase a motorcycle. Three days before the murder, Appellant left a threatening telephone message[3] on Zack's telephone answering machine.
 {¶ 29} Then two days after the murder, Appellant took the motorcycle to his ex-wife in Pennsylvania and left it there. He traveled in the dark of night and covered the neon green stripes on the motorcycle with duct tape to avoid notice.
 {¶ 30} The key question for the jury in this case was the identity of the person who rode the motorcycle towards the victim's automobile and fired the shot, killing him. The state sought to establish that Appellant was the assailant in several ways. First, they established that the motorcycle they were able to recover from Appellant's ex-wife was, in fact, the motorcycle purchased by Appellant just before the murder.
 {¶ 31} Next, they produced five individuals who witnessed the motorcycle and rider on the day of the murder. The witnesses all described the motorcycle as being dark, or green and black with some white. According to these witnesses, the motorcycle was consistent with the motorcycle that was admitted into evidence, which was a "ninja-type" motorcycle. The rider was described as wearing dark clothing and a dark helmet with a face-shield.
 {¶ 32} The defense sought to counter that evidence with three additional witnesses, none of whom successfully disputed the state's evidence on this point. The first defense witness described the motorcycle as black and white, but stated that there was sun glare reflecting off of it. Another said the motorcycle produced by the state was similar, except larger than the one she saw at the scene. It is not unreasonable to conclude that a motorcycle in a courtroom would appear to be different in size that one viewed at a distance.
 {¶ 33} The third witness described the motorcycle as being sour-apple green and cream in color and wing-like. She was certain that the motorcycle she saw at the scene was not the motorcycle placed in evidence, and she was similarly certain that Appellant was not the rider. However, this witness also described the rider as wearing brown casual dress shoes, brown socks, brown dress pants, silk brown jacket with an elastic waist, and an "ugly" rust-colored shirt underneath. Though she said he wore a black helmet with a grey shield, she could tell that he had no mustache, had brown eyes, looked Iranian — and was not Appellant. The witness was so specific in her description of the rider, even as to facial features under a shielded-helmet and the color of the rider's socks, that a jury might well doubt the credibility of her testimony or perhaps question whether she was looking at the same motorcycle and rider as the other witnesses. Upon review, the weight of the evidence therefore supports a conclusion that Appellant's motorcycle matched the motorcycle used by the assailant.
 {¶ 34} Furthermore, the timing of the purchase and disposal of the motorcycle, as well as the fact that Appellant made the trip to Pennsylvania in the middle of the night, with duct-tape concealing green neon stripes on the motorcycle, was not satisfactorily explained by the defense. The jury, as well as this Court, are entitled to weigh this evidence and draw reasonable inferences from such behavior.
 {¶ 35} The state also presented evidence that Appellant and Cindy George had a relationship. This evidence came from friends who saw them together, were aware of their frequent telephone conversations, or heard Appellant refer to her as his girlfriend. It also came from neighbors who saw Cindy George frequently visit Appellant's apartment through 2001 and 2002. While the Georges had seven children, they also had a child-care provider who came to their home four days a week, permitting Cindy George to leave the home and she frequently did so. On August 5, 2000, Appellant listed Cindy Rohr (the maiden name of Cindy George) as the emergency contact on his apartment rental application. Bank records establish that Cindy George paid Appellant's cell-telephone bills for March and April 2001.
 {¶ 36} In his statement to the police, Appellant denied having much of a relationship with Cindy George, describing her only as someone with whom he rode bikes. He also denied knowing anything about a relationship between Zack and Cindy George. The weight of the testimonial evidence as well as the documentary evidence demonstrating a close relationship between the Appellant and Cindy George leave Appellant's denials with little credibility.
 {¶ 37} Additional evidence of a developing plan between Appellant and Cindy George came in the form of telephone records from the relevant time periods. Those records establish that the two were in extensive contact both before and after the purchase of the motorcycle, before and after the murder, and while Appellant was disposing of the motorcycle in Pennsylvania.
 {¶ 38} Appellant did not openly admit involvement in the crime. However, in the spring of 2001, he did tell his ex-wife that he got into a fight with a "white-haired Israeli" and beat him up. Later, when his ex-wife saw a newspaper story about the murder with a picture of the white-haired victim, who was described as an Israeli paratrooper with dual citizenship, she asked him, "Was that you?" Appellant did not deny it, but answered: "Well, let's just say the guy's going to have a hard time parting his hair from now on."
 {¶ 39} For his part, in addition to attempting to dispute the evidence describing the motorcycle, Appellant sought to establish that he could not have been at the scene of the homicide because he was at a friend's home in Canal Fulton, Ohio and then at a car show in Massillon, Ohio. The homicide was placed at 12:09 p.m. on June 16, 2001. Testimony established that it is a forty-minute drive from the scene of the crime to Canal Fulton. In his statement to the police, Appellant stated that he was at Mike Frasher's home in Canal Fulton at 10:00 that morning and spent the rest of the day at the car show with Mike Frasher, Randy Cole, and Robert Cole. Each of them testified at the trial.
 {¶ 40} Mike Frasher testified that Appellant arrived at his home in Canal Fulton, driving his automobile, dressed in jeans and a T-shirt, and behaving normally. Initially, Frasher stated that Appellant arrived at 12:30 p.m. or 12:45 p.m., and stayed 45 minutes to one hour. Upon consideration of telephone records during cross-examination, Frasher concluded that Appellant must have arrived after 12:56 p.m. Frasher further testified that he also saw Appellant at the car show about 6:00 p.m. or 7:00 p.m. that evening.
 {¶ 41} Robert Cole testified that he was with Appellant at the car show sometime between 1:00 p.m. and 3:00 p.m. Randy Cole stated that he received earlier telephone calls from Appellant, but did not see him at the car show until lunch time or a little after. He stated there was nothing out of the ordinary about Appellant that day.
 {¶ 42} Even if credited, the testimony of the defense witnesses does not establish that Appellant could not have been at the scene of the homicide when the murder took place. At best, it places Appellant in Canal Fulton approximately 45 minutes after the homicide. While this would require close-timing, based upon the testimony, it is possible. Furthermore, the fact that the testimony of the defense witnesses is inconsistent with the statement of Appellant, serves to further weaken Appellant's position.
 {¶ 43} Appellant also attempted to suggest that other people had reason to kill Jeff Zack, but none of these reasons seem very reasonable or likely. For example, there was a dispute between Zack and a home-siding contractor who absconded with Zack's insurance money. Appellant suggests the contractor was therefore a potential murder suspect. In that situation, however, Zack would appear to be the wronged party, and the contractor would have no reason to seek revenge.
 {¶ 44} Appellant also showed that Zack's family was threatened by the owner of a brokerage firm when Zack cooperated with the authorities in an investigation of illegal operations by the firm. However, this investigation occurred twelve years ago and in California.
 {¶ 45} Last, Appellant pointed to a shattered sunroof window on an automobile Zack drove while visiting in Arizona. No one was certain, though, that the window was actually broken while Zack was driving the automobile.
 {¶ 46} Finally, Appellant questions why he and Cindy George would plot a murder to get rid of a man who "was out of the picture anyway?" While often relevant, motive is not an element of the crime of aggravated murder and it is not indispensable that motive be established. Some people act without a motive or with inconsistent motives, and others act with a hidden motive. In this case, the mere termination of Zack's affair with Cindy George does not necessarily eliminate any motive that may have previously existed. The parties stipulated, for example, that DNA testing established that Zack was the biological father of one of the children being raised by Ed and Cindy George.
 {¶ 47} Appellant has cited United States v. Turner (E.D.Mich. 1979), 490 F. Supp. 583, for the proposition that, where the jury is presented with two sets of circumstantial evidence of relatively equal weight, with one pointing toward guilt and one pointing toward innocence, reasonable minds must then have a reasonable doubt as to the guilt of the evidence. However, this rule applies only in a "toss-up situation" where the evidence is equally consistent with a theory of innocence as with guilt. See, e.g., United States v. Leal (C.A. 6, 1996), 75 F.3d 219, 223. We do not find the evidence in this case to be so.
 {¶ 48} After carefully reviewing the entire record, weighing all the evidence and reasonable inferences drawn therefrom, and considering the credibility of the witnesses, this Court cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice when it convicted Appellant of aggravated murder. Further, this Court has previously observed that "[b]ecause sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." (Emphasis omitted.) State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at 4. Since we have already determined that Appellant's conviction was not against the manifest weight of the evidence, we must necessarily conclude that there was sufficient evidence to support the verdict in this case. Accordingly, Appellant's third and fourth assignments of error are not well taken.
 Assignment of Error Number Five
"The trial court violated appellant's Fifth and Sixth Amendment rights as guaranteed by the United [States] Constitution in overruling appellant's pretrial motion to suppress post arrest statements of appellant."
 {¶ 49} Through his fifth assignment of error, Appellant has contended that the trial court erred in overruling his motion to suppress.
 {¶ 50} On December 13, 2002, Appellant filed a motion to suppress statements made to police officers following his arrest. In his motion, Appellant conceded that he was advised of his Miranda rights and stated that his attorney recommended he not talk to detectives, but proceeded to answer questions, upon being assured that he could stop at any time and contact his attorney.
 {¶ 51} The trial court found that the full and complete Miranda
warnings were given to Appellant, that Appellant knowingly, intelligently, and voluntarily waived his rights, and that he agreed to speak with two Akron police officers. During the course of the interrogation, Appellant indicated that he wanted to stop the interview and speak with an attorney. The trial court found that the interview ceased immediately and, therefore, denied the motion to suppress.
 {¶ 52} On appeal, Appellant has claimed that "he made a statement that could reasonably be construed to be an expression of his desire for the assistance of an attorney and that cessation of questioning was required." However, Appellant has not provided the precise language of what that statement may have been. See App.R. 16(D).
 {¶ 53} A suppression hearing was conducted and a transcript of the suppression hearing is included in the record. The sole witness at the hearing was Detective Vincent Felber.
 {¶ 54} The record of the suppression hearing indicates the following. Appellant was arrested at 3:30 p.m. on September 25, 2002. Detective Felber and Lieutenant David Whiddon met with Appellant at 4:20 p.m. and the interview was concluded at 5:10 p.m. — within two hours of the arrest. Lieutenant Whiddon took notes of the interview; no tape recording was made. At the time of the interview, the officers were aware that Appellant was represented by Attorney Lawrence Whitney.
 {¶ 55} The police officers first indicated that they wished to ask Appellant questions about the Zack murder and they then read him hisMiranda rights. Appellant stated that he understood those rights, and wished to talk to the police officers. Appellant indicated that he had spoken with his attorney earlier in the day and told him that he wanted to talk to the police. The police officers asked whether Appellant was trying to tell them that he wanted to talk to his attorney. Appellant indicated that he did not, and he would answer their questions. Appellant took his attorney's business card out of his pocket and laid it on the table. Detective Felber asked whether he was bringing the card out because he wanted to talk to his attorney. According to Detective Felber, Appellant said, "This is my attorney. I just want you to know who he is." Detective Felber again asked whether Appellant wanted to talk to his attorney and Appellant indicated that he did not.
 {¶ 56} The officers proceeded to question Appellant about Cindy George, and Appellant answered their questions. He denied having much of a relationship with Cindy George. Appellant then indicated that his attorney advised him that he should account for his whereabouts at the time of the murder. He therefore stated that he was at a friend's house and a car show in Massillon, Ohio at the time of the homicide. The officers continued by asking Appellant more questions about Cindy George. Appellant described her as someone with whom he rode bikes. Appellant also stated that Cindy George advised him not to talk to the police without legal representation. The police then questioned Appellant about Jeff Zack and again about Cindy George. He denied knowing Zack or knowing anything about Zack and Cindy George having a relationship. No mention of Appellant's attorney was made in that discussion.
 {¶ 57} Finally, the officers asked whether Appellant ever owned a motorcycle, what kind of motorcycle, and whether he still owned one. Appellant answered that he had owned many motorcycles and still owned a Honda. Appellant then indicated that he wanted to talk to his attorney, because he felt "we had one up on him." The police officers immediately stopped questioning Appellant, and they left the room.
 {¶ 58} In Davis v. United States (1994), 512 U.S. 452, 461 the United States Supreme Court held that "after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." It is not sufficient for a suspect to indicate that he might want a lawyer. Davis, 512 U.S. at 459. For example, statements such as, "I think I need a lawyer," "Maybe I should talk to a lawyer," and "I think that I would like an attorney" have been deemed too ambiguous to invoke theMiranda right to counsel. See State v. Henness (1997), 79 Ohio St.3d 53,63; Davis, 512 U.S. at 462; State v. Taylor (Feb. 9, 1999) 9th Dist. No. 2783-M, at 4.
 {¶ 59} Moreover, in the present case, there is no evidence that Appellant in any manner actually requested to speak to his attorney; rather, he merely referred to his attorney. Police officers are not obliged to cease questioning a suspect merely upon "the making of an ambiguous or equivocal reference to an attorney." (Emphasis added.)Davis, 512 U.S. at 459; see, also, State v. Williams, 99 Ohio St.3d 439,2003-Ohio-4164, ¶ 33-34. (Shouting an attorney's name and complaining about the police chasing an attorney away do not constitute an unequivocal request to see counsel.). Instead, the suspect must unambiguously and unequivocally request counsel. Davis, 512 U.S. at 459.
 {¶ 60} This court has previously indicated that it is of no significance that the police officers knew that the accused had counsel and knew the identity of his counsel. State v. Stover (Apr. 16, 1997), 9th Dist. No. 96CA006461, at 8. Indeed, as pointed out by the concurring judge in that case, the accused not only had his Miranda warnings, he had its benefits as well, because he had an attorney. "That [the accused] chose to reject both is his own doing." Stover, supra at 9, Reece, J., concurring.
 {¶ 61} Appellant admits that he was advised of his Miranda rights, that he had an attorney, and that he had recently spoken with him. The court below found that Appellant made a knowing, intelligent, and voluntary waiver of his Miranda rights and agreed to speak to Detective Felber and Lieutenant Whiddon. The court also found that when Appellant subsequently indicated that he wanted to talk to an attorney, the statement ceased immediately. The trial court therefore overruled the motion to suppress. We see no reason to disturb that finding. None of Appellant's references to his attorney were an unequivocal and unambiguous request to speak to counsel. Consequently, the trial court did not err in refusing to suppress Appellant's statement to the police officers. Appellant's fifth assignment of error is not well taken.
 III {¶ 62} Appellant's five assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
Slaby, P.J. and Baird, J., concur.
[1] Crim.R. 5(B) provides that "[i]n felony cases a defendant is entitled to a preliminary hearing unless waived in writing." The rule further provides that such hearing shall be held within ten days of arrest if the defendant is in custody and within fifteen days if he is not in custody.
[2] R.C. 2945.73(A) and R.C. 2945.71, taken together, provide that a charge of felony shall be dismissed if the accused is not provided a preliminary hearing within fifteen days after arrest if he is not held in jail or within ten consecutive days after arrest if he is held in jail.
[3] The message left by Appellant on Zack's answering machine was: "Okay, Jeff, you got one more out. I guess I'm going to have to call your parents in Phoenix. You better pick up the phone." According to Zack's wife, when he heard the message, he became upset and frantic.